Michael Dieni
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>FRANK R. TALAS, JR.,<br><br>    Defendant. | Case No. 3:06-cr-0011-RRB-JDR<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

Defendant, Frank R. Talas, Jr., by and through counsel Michael Dieni, Assistant Federal Defender, submits his sentencing memorandum.

  1.  Introduction

This is an unusual case.  Two well-meaning people undertook the responsibility of caring for Don Mitchell, their father and father-in-law, who was in the midst of Alzheimer's disease.  In the process, they acquired the task of managing his money, more money than they had ever seen before.  Neither Frank Talas, a man with no criminal record and no history of any type of anti-social behavior, nor his wife of thirty plus years, Phyllis Talas, had any experience handling money matters.  In doing so, as conservators,

they had the authority to expend and invest Mr. Mitchell's assets. Unfortunately, the line between their duty as conservators and their own goals became blurred, and they crossed the line.

The overall record, however, strongly supports the proposition that Mr. Talas poses no threat to the community. Upon consideration of the factors set forth in 18 U.S.C. § 3553(a), a probationary sentence is both authorized by law and appropriate.

   2.   *The offense*

The tragedy began in the year 2000, when Beulah Mitchell, Don Mitchell's wife (Phyllis' mother), died and left Donald Mitchell alone. It is now believed that she had concealed Don Mitchell's early onset of Alzheimer's disease from the remainder of the family. Shortly after her death, at around the end of the year 2000, Don Mitchell moved to Florida to live with a friend. He had been there only six months when reports came back to Phyllis and Frank that he was behaving bizarrely. (Exhibit A)

Frank and Phyllis sent Scott Talas, their 20 year old son, to Florida to observe the situation. It was immediately decided that Don was no longer safe by himself and in May 2001 Scott brought Don back to Alaska, where Don moved in with Frank and Phyllis. At this point, Frank and Phyllis undertook the task of taking care of Don, in their home. Part of that process involved handling his property and paying his bills. This meant that Frank and Phyllis needed to have access to and to deal with his finances.

During the next year, beginning in July 2001, Frank and Phyllis went through the process of becoming court approved formal guardians. While this process was happening, especially while they lived together, their funds had been commingled. It appears that they grew accustomed to using their money as a collective, in ways that

2

benefitted everyone. This way of viewing the situation continued, even after Mr. Mitchell's condition declined to a point he had to move into a nursing home. As his sole real social connection to the world outside of the nursing home, they came to view his interests and theirs as one and the same. Over time, however, they failed to adequately separate their own interests from their specific duty as conservators. Although they often used Mr. Mitchell's money in ways that they believed benefitted the family as a whole, their financial decisions were inconsistent with the basic restrictions of the guardianship.

For example, Mr. Mitchell had a small residence in Anchorage that was very run down and virtually uninhabitable. Certainly, Mr. Mitchell could not make beneficial use of it. The Talases had been living in an apartment some six miles from the nursing home. Commingling Mr. Mitchell's interests with their own, the Talases sold Mr. Mitchell's Anchorage home and used the proceeds to buy a small parcel of land and a mobile home trailer that was only two miles from the nursing home, a much easier drive, especially during winter months, which helped them visit Mr. Mitchell on a regular basis.

Mr. Talas had long held the dream of starting his own handy-man business. He took money from Mr. Mitchell's accounts, and attempted to invest in Silver Cub and Wolf, his own handy-man business. His goal, of course, was financial independence. Mr. Talas now saw himself as the head of the family, and he believed that his success would benefit everyone, including Mr. Mitchell. Unfortunately, Mr. Talas had never before undertaken such a venture, and the business, in the course of one year, failed to thrive.

Mr. Talas now fully understands that he made huge mistakes by not following the strict rules of the conservatorship. His guilty plea in this regard is earnest, and he blames no one other than himself.

Nothing in Frank Talas's background, however, could have predicted that at age 53 he would now face the potential of federal prison.

3.   *The offender – background and circumstances*

Mr. Talas has lead a quiet and conservative workingman's lifestyle. He has never been a threat of harm to the community around. Nor does he seem to do so for the future. The offense itself is unusual, strictly specific to unique facts, and the likelihood of repetition is nil. The history of Mr. Talas's life supports these assertions.

He is 53 years of age, with no prior criminal history, no police contacts and no history of any sort of anti-social behavior. He has no significant history of substance or alcohol abuse. He has been married to Phyllis for 32 years, since he was 21 years of age. They have raised two children to adulthood. He has been a solid family man. (Exhibit B)

His working life began when he served his country in military service, in both the Army and the National Guard, from 1971 to 1985. He received a variety of medals and concluded each tour with an honorable discharge. He left due to medical problems.

Since that time, he has engaged himself in a variety of types of employment ranging from security guard positions to mechanical work on recreation vehicles. Most recently he has been employed with Alexander's RV Rental doing maintenance work. A letter from his current supervisor, praising Mr. Talas's work performance is attached. (Exhibit C)

People who know Frank all speak well of his commitment to family, workmates and the community. (Exhibits A, B, C, D)

*4.     The PSR contains a miscalculation in the sentencing guidelines*

The parties have stipulated that the appropriate advisory sentencing guideline computation should not include the two level enhancements for abuse of position of trust and "vulnerable victim." U.S.S.G. §§ 3A1.1(b)(1) and 3B1.3. Mr. Talas respectfully objects to the PSR inclusion of these enhancements on the grounds of double-counting. Thus, the correct advisory guideline recommendation should be 18 to 24 months, not 30 to 37. The mistake in the PSR involves a misunderstanding of the law.

Double-counting occurs when two separate guidelines are used to penalize a single element of an offense. *United States v. Nagra*, 147 F.3d 875, 883 (9th Cir.1998) (double counting usually occurs when an element is counted twice in computing the total offense level).

The method used in the PSR double counts single elements of the essential offense of conviction. Here, U.S.S.G. § 2B1.1 is used to establish the base offense level for the offense of "Misappropriation of Funds by a Fiduciary." Therefore, for Mr. Talas to be guilty of this offense, the government was required to prove that he abused a position of trust (fiduciary status) that involved a guardianship/conservatorship, which, by definition, inherently involves an incompetent, a vulnerable victim. If these elements had not been proven or admitted by Mr. Talas in his guilty plea, Mr. Talas could not be found guilty and § 2B1.1 would not apply. In other words, the sentencing guidelines set forth in § 2B1.1 establish an offense level of 18 only because the essential elements of the offense, including facts that must include an abuse of position of trust involving a vulnerable victim, are proven. Therefore, the application of § 2B1.1 automatically must take into account the essential elements of the offense in establishing the base offense level. To add the two

enhancements for the same elements used to apply § 2B1.1 in the first instance is double counting.

> 5. *Legal framework allows for probation or a fine as an alternative to imprisonment*

The offense, Misappropriation of Funds by a Fiduciary, is a Class D felony. 38 U.S.C. § 6101; 18 U.S.C. § 3559(a)(4). The court is not required to impose a jail sentence; there is no mandatory minimum sentence. The penalty for violation of Title 38 U.S.C. § 6101 specifically allows for a fine as an alternative to incarceration. If the court finds that incarceration is "necessary," pursuant to the sentencing factors set forth in 18 U.S.C. § 3553, imprisonment of up to five years is authorized under 38 U.S.C. § 6101. Finally, the federal statute governing Class D felonies specifically allows that a person convicted of a Class D felony is eligible for probation as an alternative to incarceration. 18 U.S.C. § 3561(a).

If the court imposes incarceration, supervised release for up to three years is authorized. 18 U.S.C. § 3583(b)(2). If the court imposes probation, supervision for up to five years is authorized. 18 U.S.C. § 3561(c).

The decision of *United States v. Booker* has broad ramifications for this proceeding. Even if no formal downward departure can be specifically found, the sentencing guideline range is only a factor among factors to be considered by this court.

The basis for any sentence begins with 18 U.S.C. § 3553(a), which raises the fundamental question: What sentence is "sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2)?" This so-called "parsimony provision" is not simply a factor to be considered in determining the sentence – it is the

primary guiding principle behind all non-mandatory sentences and represents the hard and fast cap above which the court is statutorily prohibited from sentencing, even if a greater sentence might be recommended by the sentencing guidelines. *See United States v. Denardi*, 892 F.2d 269, 276 (3d Cir. 1989).

      Therefore, while the court may logically begin with a discussion of the guidelines, the sentencing guidelines are only one of five factors to be considered in determining the sentence. *Id.; Booker*, 125 S. Ct. at 764-65. The other four factors are (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the need to avoid unwarranted sentencing disparity; and (d) the need to provide restitution. *Id.*; 18 U.S.C. §§ 3553(a)(1), (a)(6)-(7).

      The Ninth Circuit has established that this court has exceptionally broad authority to be lenient in the context of a first-time offender convicted of a property offense. *United States v. Menyweather*, 431 F.3d 692, 696-97 (9th Cir. 2005). In *United States v. Menyweather*, the trial court imposed a sentence of 40 days, to be served on weekends, as a condition of probation for an employee of the United States Attorney's Office who embezzled approximately $436,000. The defendant had used the money frivolously to travel around the world and buy expensive items for herself. The Court of Appeals affirmed the sentence.

      6.    *Conclusion*

      This is a difficult case. The chance of re-offense is nil. Mr. Talas poses no threat to the community; he fully accepts responsibility. In some respects, this is a family

matter. A great deal of the money at issue here arguably would have come to the Talases as an inheritance. For this reason, it is anticipated that the government will not be asking for restitution anything like the amount of loss which technically applies in guideline computation.

Under these circumstances the court would make no mistake to give Mr. Talas a largely probationary sentence. He is prepared, as he must be, to go to jail, but it is unclear that it is necessary. A probationary sentence driven by community work would equally serve justice.

DATED this 21st day of September, 2006.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Michael D. Dieni
Assistant Federal Defender
Alaska Bar No. 8606034
601 West 5th Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mike_dieni@fd.org

Certification:

I certify that on September 21, 2006, a copy of the
foregoing document, with attachments, was
served electronically on:

Karen L. Loeffler, Esq.

David R. Weber, Esq.

/s/ Michael D. Dieni